STATE OF IOWA, Appellant, v. ARTHUR H. LANDES, Appellee.

No. 42861

JULY 17, 1935.

Edward L. O'Connor, Attorney General, Walter F. Maley,· First Assistant Attorney General, and P. J. Siegers, County Attorney, for appellant.

T. J. Bray, and Cross & Hamill, for appellee.

DONEGAN, J.—The defendant, Arthur H. Landes, was charged in a county attorney's information with the crime of rape upon one Evelyn Conrad, a female child under the age of 16 years. He pleaded not guilty, and upon the trial of the case, after the state had rested, he moved for a directed verdict of acquittal. This motion was sustained by the court, and the state appeals.

One of the grounds of the appellee's motion to direct a verdict in his favor was that there was no evidence corroborating the prosecuting witness and tending to connect the defendant with the commission of the crime with which he was charged. Practically all of the briefs and arguments of both appellant and appellee are directed to the question thus raised.

The defendant was a farmer living about five miles west of Grinnell, in Jasper county, Iowa. His family consisted of himself and his wife only. Some time prior to November 9, 1931, the defendant had made inquiries in regard to taking .into his home a girl from the Iowa Soldiers' Orphans' Home at Daven-

port. On November 9, 1931, after application blanks had been sent to him, he wrote a letter to the superintendent of the Iowa Soldiers' Orphans' Home, and again on November 23d he wrote a second letter to the superintendent and inclosed the application blanks which had been executed by himself and his wife. It appears that the application was approved, and on January 31, 1932, Evelyn Conrad, the prosecutrix in this case, went to live in the defendant's home and continued to live there until July 23, 1934. On July 21, 1934, Mrs. L. J. Comparet, a state agent of the bureau of child welfare, in response to a letter containing some complaint about the treatment of the child, Evelyn Conrad, paid a visit to the Landes home where she talked to Mr. and Mrs. Landes. She also had a private conversation with Evelyn Conrad during the course of a short automobile ride, after which Evelyn was returned to the Landes home. On July 23, 1934, in response to a further complaint concerning the treatment of Evelyn Conrad, Mrs. Comparet again returned to the Landes home. When she first called on this day, Mr. Landes was not present and she had a conversation with Mrs. Landes in which she told her that she had received a letter stating that there were suspicions as to the relations existing between Mr. Landes and Evelyn. After talking to Mrs. Landes and Evelyn Conrad, Mrs. Comparet went away and returned toward evening, at which time she talked to both Mr. and Mrs. Landes. She again left the Landes home about 7 or 7:30 o'clock in the evening, and again returned between 10 and 11 o'clock that night. On this last visit she took Evelyn Conrad with her, and two days afterward, on July 25, 1934, Evelyn was subjected to a physical examination by Dr. Knight E. Fee, the home physician of the State Juvenile Home at Toledo. Before this examination Evelyn had already told Mrs. Comparet that she had sustained sexual relations with the defendant, Arthur H. Landes, and the examination conducted by Dr. Fee showed that there was no trace of the hymen. Evelyn was not returned to the Landes home, and, on August 2d, the defendant was arrested and brought to the sheriff's office at Newton, where he underwent some questioning in the presence of the sheriff, the county attorney, and Mrs. Comparet.

Upon the trial of the case, the prosecutrix testified as to the acts of sexual intercourse with the defendant. There was no other direct evidence corroborating the testimony of the prose-

cutrix and tending to connect the defendant with the commission of the offense. Section 13900, Code 1931, provides:

"The defendant in a prosecution for rape * * * cannot be convicted upon the testimony of the person injured, unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense."

It is contended by the appellant that the circumstantial evidence was such as to constitute sufficient corroboration and compliance with the statute. Many circumstances are set out by the appellant which it is claimed are sufficient to constitute this corroboration. It is claimed that some of these circumstances show that the appellee deliberately created the opportunity for intercourse with Evelyn Conrad; that other circumstances show that no other person except the appellee had an opportunity to have sexual intercourse with her; and that still other circumstances, consisting of statements and conduct of the appellee, show a guilty knowledge on his part.

The circumstances which the appellant claims show that the appellee deliberately created the conditions under which he later had sexual relations with the prosecutrix consist of statements made in the application signed by appellee and his wife, and of statements contained in the two letters written by appellee to the superintendent of the Soldiers' Orphans' Home. It is well settled that evidence that a defendant had opportunity to commit the crime of rape does not constitute the corroboration required by the statute. It has been held, however, that, if the evidence shows that the defendant created the opportunity for the specific purpose of committing the wrongful act, this would constitute sufficient corroboration. In the application made to the Soldiers' Orphans' Home it was stated that the defendant was 50 years of age, his wife 49 years of age, and that they desired a healthy, normal girl, not over 14 years of age. In the letter of November 9, 1931, to the superintendent of the institution, the appellee stated: "We don't want a girl to be a drudge but an infusion of new life into our home and we'll do all in our power to make her contented and happy. * * * But I am not willing to send her to town to high school as I can't move there and too many girls have gone to wreck by going there alone. * * * I am in such haste I do not know if I have expressed myself clearly but we want a girl who has good health, normal intelligence, is

reliable, pleasant and obedient, and willing to help maintain a good comfortable home. I'm not rich but can give a good home to some girl who is not so well situated.'' And in the letter of, November 23, 1931, he said: ''I can imagine that she may have some misgivings about coming to a strange place, to strange people, and knowing nothing of what fate may await her. I can imagine myself in her place. She will have no need to worry. If she is the kind of girl we want, one who will be obedient and try to help us and be cheerful about it she shall have the best of treatment and of care. There are certain qualifications she must have and upon which we cannot compromise. She must be healthy and normal physically and mentally and passably good looking. She must be sincere, reliable and pleasant. We feel these qualities are not too much for which to ask. * * * If you have no girl of 14 years who in your opinion would be what we want we might take one 15 but not older. We think 14 better. Or one 13 if well advanced and developed.''

The application in question was signed by both the defendant and his wife, and we see nothing in the statements of the ages of the husband and wife and the fact that they desired a normal, healthy girl of 14 years of age which tends to show that the appellee was endeavoring to create an opportunity for sexual intercourse. Nor do we see anything in the excerpts from the two letters which, even when taken by themselves and without reference to the context of the letters in which they appear, indicates an intention to create an opportunity for the wrongful acts which it is claimed were later committed. In our opinion, the statements referred to are as consistent with good intentions as they are with any intention to create a condition under which the appellee could commit the acts with which he is charged; and, when we consider these statements in connection with the full context of the letters in which they appear, we think that the construction for which the appellant contends could only be reached by giving to the language relied upon a strained and unusual meaning. Moreover, the application and both letters were signed by the appellee in November, 1931, the prosecutrix went to the defendant's home on January 31, 1932, the first act of sexual intercourse is claimed by the prosecutrix to have taken place May 13, 1932, and the first suggestion of sexual intercourse was made to her by the appellee only a short time before the latter date. It seems quite probable that, if the appellee had

been actuated by improper motives at the time he began to make arrangements for the placing of a young girl in his home, he would not have waited until about six months from that time and about three months from the time Evelyn Conrad came to live in his home before making any attempt to take advantage of the opportunity which it is claimed he thus created. In our opinion, the statements in the application and in the letters which are relied upon by the appellant as showing that the defendant created the opportunity for sexual intercourse with the prosecutrix are not sufficient to establish the corroboration required by the statute.

It is contended by appellant that the evidence is sufficient to show that the appellee was the only person who had an opportunity to have sexual intercourse with Evelyn Conrad during the time that she resided in his home. The circumstances relied upon to support this contention are that the defendant himself, in conversation with Mrs. Comparet, the state agent, stated that, if anything was found wrong with the prosecutrix he did not know how it could have happened; that there were some bad boys around the community but she did not go out with any of them; that there were only two occasions upon which Evelyn Conrad remained away from the defendant's home over night, and that on both of these occasions there was no opportunity for any other person to have sexual intercourse with her; and that on one occasion the defendant's wife was absent for a week attending the World's Fair in Chicago, and that on another occasion she was absent about two weeks while a relative of hers was sick, and on neither of these occasions was any other person living in the house with the defendant and the prosecuting witness. Appellant argues and cites cases to support its contention that this evidence not only showed opportunity on the part of the appellee, but excluded opportunity on the part of any other person, and that it therefore tended to connect the defendant with the commission of the offense and was a compliance with the requirements of the statute. In the cases cited by the appellant, however, the evidence was such as to establish the commission of the crime at a particular time and place and to preclude the probability of any other person having had intercourse with the complainant at the time and place when and where the offense was alleged to have been committed. In the case at bar, the only evidence as to the particular act of intercourse alleged in the

indictment was that of the prosecutrix herself. The only evidence other than that of the prosecutrix tending to show that any one had had intercourse with her was that of the two doctors who examined her. One of these doctors testified that a little fringe or edges of the hymen remained, that there was nothing to indicate when the hymen had been ruptured, that the condition which he had discovered could have been caused otherwise than by sexual intercourse, that he could not say of how long standing it was, and that it might have been months or years. The other doctor testified that he found no evidence whatever of a hymen, that it is entirely possible that there are girls or women in which that membrane is entirely absent, that there was no way of telling when the hymen had been ruptured or method by which it had been ruptured, and that the condition which he found would not necessarily have been caused by sexual intercourse.

We do not think the circumstances in evidence were such as to corroborate the testimony of the prosecutrix to the extent of connecting the appellee with the commission of the offense and excluding all other persons. The prosecutrix had lived in the defendant's home from January, 1932, until July, 1934. So far as the evidence in this case is concerned, aside from the testimony of the prosecutrix, there is not even a scintilla of evidence tending to show any improper or even suspicious relations between the appellee and the prosecutrix until a few days before the appellee was arrested and charged with the crime. The appellee undoubtedly had the opportunity to commit this crime on many occasions during the two and one-half years that Evelyn Conrad resided in his home. But opportunity alone is not sufficient corroboration under the statute. And while neither the defendant nor any other witness knew of the prosecutrix having associated with any other men or boys, it is a matter of common knowledge that sexual intercourse with a child of her age, if it took place, would naturally be done with great secrecy. Even assuming that the physical condition of the prosecutrix was caused by sexual intercourse, we do not think that it can be said that the evidence in this case is such as to exclude either the possibility or the probability of such intercourse having been with some person other than the appellee.

In this connection we may properly advert to the further contention of the appellant that the court erred in excluding

evidence offered by the appellant in connection with this phase of the case. The appellant offered to prove by one John Waldbusser that he resided across the road from the defendant's home, that the driveway and the home of the defendant are visible from his home, and that he had never seen any young men going into the property of the defendant and had never seen Evelyn Conrad keeping company with any boys during all the time she resided in the defendant's home. Appellant also offered to prove by Mrs. Horace Adkins that she had known Evelyn Conrad intimately during all the time that Evelyn had resided in the defendant's home, and that she never knew Evelyn to be keeping company with any boys or men. This offer was rejected by the court, and the exclusion of this evidence is alleged as error. As already said, if the physical condition of the prosecutrix had been caused by sexual intercourse, this undoubtedly would have been carried on in secret, and it seems to us that it is hardly necessary to argue the proposition that even if the evidence which was offered had been introduced it would not have been sufficient to exclude the possibility or probability of the prosecutrix having had intercourse with some other person and thus tend to connect the defendant with the commission of the offense charged.

Finally, it is contended that statements and conduct of the defendant which are in evidence are such as to show a guilty conscience and thus furnish the corroboration required by the statute. On the 21st day of July, 1934, on the occasion of the first visit of the state agent to the Landes home, the defendant stated that he was anxious to adopt Evelyn Conrad. At that time there was also present a witness, James Phipps, who testified that, when Mrs. Comparet took Evelyn in her car for a short ride, he remarked to the appellee, in substance, that appellee would never see the girl any more, and that thereupon the appellee looked down at the floor, looked bad and colored, turned very red, a purply color. It is claimed by the appellant that this constituted evidence indicating a guilty conscience. In our opinion, there would be scant security in the provisions of the statute if testimony such as this could be considered corroboration. At the time this incident is alleged to have occurred, no charge had been made against Landes or any other person in regard to any improper relations between Landes and the prosecutrix. The application signed by the defendant and his wife had indicated

that they might desire to adopt this girl, and he had already talked to the state agent about doing so. It is just as probable, if not more probable, that anything unusual or peculiar in Landes' conduct or appearance, when the statement was made to him by Phipps that he would never see the girl again, was caused by disappointment or anger as it was by any consciousness of guilt. Again, it is said that upon the visit of the state agent on July 23d, the Monday following the first visit which was on Saturday, appellee again evidenced an eagerness to adopt this girl; that when told by the state agent that she intended to have Evelyn subjected to a complete physical examination he asked what that consisted of, and, when told that it included everything, heart, lungs, female organs, etc., he said, "Well if you find anything wrong I don't know how it could have happened. There were some bad boys around this community but she didn't go out with any of them"; and that at the end of this conversation he stated that he was going to see his lawyer the first thing in the morning so that he would be prepared for anything that might come up. It must be recalled that, as already said, Mr. and Mrs. Landes had both spoken of adopting this girl in the original application made to the Soldiers' Orphans' Home and that he had again spoken of adopting her on the previous visit of Mrs. Comparet on the preceding Saturday, before anything was said regarding improper relations between Evelyn and himself; that this visit during which the conversation herein involved took place was on the evening of Monday, July 23d; and that on the afternoon visit of that day the state agent had already told Mrs. Landes about a letter which suggested that there might be improper sexual relations between her husband and Evelyn. In view of these circumstances, we see nothing unusual in the inquiry of the defendant as to what the physical examination would consist of, and his statement that if anything were wrong with her he did not know how it could have happened. In our opinion, these circumstances are equally if not more consistent with innocence than with a consciousness of guilt, because, if guilty, instead of saying that he knew of no other boys or men who might have been with her, it would have been most natural for him to attempt to cast suspicion on somebody else. Nor do we see any indication of guilt in the fact that, under these circumstances, the defendant had stated that he was going to see his lawyer. If one who

knows or has good reason for feeling that he is about to be charged with an offense can be said to furnish evidence of his guilt by consulting his lawyer, there would be little opportunity left for any one to defend himself without at the same time furnishing evidence tending to prove his guilt, no matter how unjustly he might be charged.

Again, it is said that the defendant on July 28, 1934, in separate conversations with the sheriff and deputy sheriff made statements indicating his consciousness of guilt. Even if the separate statements contained in these conversations be considered apart from the balance of the testimony of these witnesses, as has been done by the appellant, we do not think they constitute sufficient evidence of consciousness of guilt to furnish the corroboration required by the statute; and, when the whole of the testimony given by these witnesses is considered, we think it is utterly devoid of anything tending to establish a consciousness of guilt on the part of the defendant. These conversations contained nothing which might not be contained in the conversation of any innocent man who knew that he was being accused with the commission of a crime, and the fact that they were had with the law enforcing officers, instead of indicating guilt would, to our minds, rather indicate a consciousness of innocence. Again, it is said that on August 2, 1934, after the appellee had been arrested, while in the sheriff's office and talking to the sheriff, the county attorney, and the state agent, upon being advised by the sheriff that the best thing to do was to tell the truth, he said: "I won't tell the truth." It appears, however, that the defendant at no time in this conversation or at any other time or place had ever admitted to any one that he was guilty, that he had consistently denied his guilt, and that in this same conversation the next remark made by him was, "I will not plead guilty to something I didn't do." Great stress, however, is placed upon the fact that the defendant did make the statement "I won't tell the truth"; and that, after making this remark, he hesitated, and after a short lapse of time proceeded to make the further statement in which he said, "I will not plead guilty to something I didn't do." A reading of the full text of the testimony in regard to this incident and a consideration of the circumstances under which the remark is alleged to have occurred convinces us that it cannot be taken as either an admission of guilt

or as evidence showing a consciousness of guilt which would be sufficient to supply the corroboration required by the statute.

It may be that the defendant is in fact guilty of the crime with which he was charged. If so, it was a heinous offense and it is most unfortunate that he cannot be punished for it. The law recognizes, however, that offenses of this kind are such that it is in the interests of justice that a defendant be not convicted without the corroboration that the statute requires. If this were not the law, many innocent men might be convicted and unjustly punished because of the desire of a prosecuting witness either to reap vengeance on the accused or to save one who was guilty, or because of some other unworthy motive. It is the duty of courts to use their endeavors to see that the law is carried out calmly and dispassionately. So far as the evidence in this case shows, there is nothing except the testimony of the prosecuting witness and the circumstances to which we have referred to connect him with the commission of the crime with which he was charged. We think the circumstances relied upon were not sufficient, either separately or as a whole, to constitute the corroboration of the prosecuting witness required by the statute. As in the trial court, so in this court, the accused must be considered innocent until properly found guilty. We, therefore, deem it not inappropriate to suggest that the vigor with which the accused has been denounced and the quotations from the poets and from the Scriptures with which appellant's argument is embellished, although perhaps an effective means of appealing to a jury, are scarcely the appropriate method to be employed in seeking to persuade an appellate court.

For the reasons stated in the opinion, the order and judgment of the trial court are hereby affirmed.—Affirmed.

KINTZINGER, C. J., and all Justices concur.